BELDING v. ARCHER.

(Filed November 18, 1902.)

1. VENUE —*Change —Trial —The Code, Sec. 195; Sub-sec. 2.*

The removal of a case from one county to another for the convenience of witnesses is discretionary with the trial judge.

2. PARTIES—*Judge—Discretion.*

The making of certain persons parties defendant on motion of the plaintiff is discretionary with the trial judge.

3. TRUSTS—*Trustees—Contracts—Evidence—Merger.*

In this action to remove trustees for a breach of trust, all prior contracts are merged in the deed of trust and memorandum thereto attached and evidence relative to matters embraced in such prior contracts is incompetent.

4. TRUSTS—*Trustees—Sales.*

The trust deed herein set out authorizes the trustees jointly to sell a part of the lands at private sale.

5. EVIDENCE—*Trusts—Trustees.*

In an action to remove trustees for a breach of trust, a report by one of the trustees is not competent against the other trustee.

6. TRUSTS—*Trustees—Evidence.*

In a proceeding against trustees for a breach of trust, the reason of plaintiff for entering into the deed of trust is immaterial.

7. EVIDENCE—*Trusts—Trustees—Breach of Trust.*

In an action for removal of trustees for breach of trust, evidence of the impracticability of getting out timber, alleged as one of the breaches, is admissible to show good faith in the trustees.

8. EVIDENCE—*Torts—Trustees—Breach of Trust.*

In an action to remove trustees for breach of trust for failure to sell the land for a fair price, it is competent to show by a surveyor a decrease of acreage on account of lappages.

9. EVIDENCE—*Trusts—Trustees—Breach of Trust.*

> In an action to remove trustees, letters written by one trustee as to the trust property are incompetent as against the other trustee.

10. EVIDENCE—*Judgment—Trusts—Trustees—Breach of Trust.*

> In an action to remove trustees for a breach of trust, the records in prior suits are admissible to show that matters alleged by the plaintiff to be unsettled by the prior contracts had been determined and settled, and were the matters referred to in the memorandum attached to the trust deed, although the plaintiff was not a party to those suits.

11. TRUSTS—*Trustees—Deeds.*

> Conveyances by a trustee and his wife to himself and a co-trustee operates as a valid conveyance to the co-trustee.

12. EVIDENCE—*Trusts—Trustees—Breach of Trust.*

> In an action to remove trustees for failure to sell land at a fair price, evidence of the value of similar land is competent.

13. EVIDENCE—*Opinion Evidence—Trusts—Trustees.*

> In an action to remove trustees for failure to make the trust property bring its full value by selling land instead of cutting the timber, it is admissible to show by an experienced lumberman the impracticability of removing the timber.

14. EVIDENCE—*Parol—Paper Writing.*

> The contents of a paper writing collateral to the issues is provable without producing the paper.

15. EVIDENCE—*Trusts—Trustees—Breach of Trust.*

> In an action to remove trustees for a breach of trust, conversations between a trustee and third persons are competent to show an effort to sell the land and to show good faith.

16. ISSUES—*Judge.*

> Where the issues submitted by the court are clear and cover the case, it is not error for the court to refuse other issues tendered by one of the parties.

17. TRUSTS—*Trustees—Breach of Trust—Removal—Questions for Jury.*

> In an action to remove trustees for breach of the trust, it is a question for the jury whether the trustees acted in good faith and exercised a sound discretion in the performance of the duties imposed upon them by the deed of trust.

ACTION by D. W. Belding against R. N. Archer and others, heard by Judge *Geo. A. Jones* and a jury, at Fall Term, 1901, of the Superior Court of CLAY County.

On the 9th of November, 1893, Milo Belding conveyed to the defendant Archer, for the consideration of $25,000, certain real estate, saw-mills, booms and personal property at and near Lenoir City, Tennessee, and also certain timber logs in Graham County, North Carolina. Archer, under the terms of the conveyance, was to conduct the business of cutting, sawing and selling lumber, and to do so to advantage, it was necessary that the mills and booms be repaired, and the tributary streams cleared out that logs might be floated to the mills. Out of the proceeds of the sale of the lumber, Archer was to reimburse himself the $25,000 advanced by him, and all advances and amounts he might make for the repairing of the mills and booms and clearing the stream of obstructions, apply $5,000 per annum to the payment of his salary, and $5,000 for his proportion of the profits; the balance of the profits to go to Belding, and the whole property to be afterwards reconveyed to Belding.

On the 8th day of January, 1895, the defendants entered into a contract, Krohn and McGarry, styling themselves trustees of the first part, and Archer of the second part, in which contract the one between Milo Belding and defendant Archer, of November, 1893, was referred to and set out *ipsissimis verbis*, and in which contract of 1895 there was a conveyance to said Archer of all the rights in law and equity of Milo Belding in and to the property conveyed in the contract of November, 1893, and also the timber on 47,000 acres of land in Graham County, North Carolina. The conveyance was in trust, the property to be used in the saw-milling business with entirely new features; the business to continue to 1900, and then the entire property to be reconveyed by Archer to the parties of the first part upon performance of certain conditions mentioned in the contract.

Vol. 131—19

Afterwards, Archer alleged breaches of the contract of 1895, brought suit in Loudon County, Tennessee, and also in Graham County, North Carolina, against the other defendants, and others, and recovered a judgment in each Court for more than $100,000. Afterwards, on the 8th December, 1899, the defendants entered into the following agreement:

"Memorandum of agreement, made in triplicate, between Robert N. Archer, of Cincinnati, Ohio, party of the first part, of Louis Krohn, of the same place, and Thomas F. McGarry, of Grand Rapids, Michigan, as trustees, parties of the second part, and the Union Savings Bank and Trust Company, of Cincinnati, Ohio, party of the third part—Witnesseth:

"That whereas, the parties of the third part, together with J. W. Cooper, of Murphy, N. C.; the estate of C. S. Bragg, Henry Six, Nathan Stix and D. W. Belding, of Cincinnati, Ohio; D. M. Hyman, of Denver, Colorado; Alvah N. Belding, of Rockville, Connecticut, and Milo M. Belding, of New York City, New York, are the owners and interested in about sixty-five thousand acres of land in Graham, Cherokee and Clay and Swain counties, North Carolina, about forty-five thousand acres in the county of Graham, the balance in the other counties above named; and whereas, there has been litigation pending between the said Archer and the said Louis Krohn, and others, in the Chancery Court of Loudon County, Tennessee, and in the Superior Court of Graham County, North Carolina, and the said Archer claims to have obtained judgment in his said case in Tennessee, and claims to have obtained the judgment of the Court in his favor in the North Carolina case; and claims to have a lien on the timber rights on the Graham County lands mentioned, as security to him for the amount due to him in said cases, the validity of which is disputed by said second parties:

"Now, thererfore, in order to settle said matters and all litigation, it is hereby mutually agreed as follows:

"I. That the amount due the said Robert N. Archer is hereby settled and agreed upon as follows: at the sum of eighty-five thousand ($85,000) dollars.

"II. That the sum shall be paid as follows: Fifteen thousand ($15,000) dollars in four months, fifteen thousand ($15,000) dollars in eight months, fifteen thousand ($15,-000) dollars in twelve months, twenty thousand ($20,000) dollars in sixteen months from date, and twenty thousand ($20,000) dollars in twenty months from date, with six (6) per cent interest on all of said sums. That in addition thereto there is due and shall be paid the sum of one thousand ($1,000) dollars, still due on what is known as the Boom Company note at the Merchants National Bank of Cincinnati, Ohio, with interest thereon to the date of payment; and all costs in the suits between said Robert N. Archer and parties of the second part, and others, in Loudon County, Tennessee, and in Graham County, North Carolina; but there shall not be included in said costs any further counsel or witness fees; all further expenses and counsel fees for appealing and arguing the case of *Hebard v. Archer et al.* in the United States Court of Appeals, at Cincinnati, Ohio, including the cost of transcript, Clerk's fees, and the cost of printing record thereof; also the just and reasonable expenses, costs and charges of handling said property, first of managing and conducting the affairs thereof, under this agreement, and the deeds accompanying the same; and all taxes which are now or may be legally levied and assessed thereon; and all expenses, costs, charges and counsel fees in the premises; and a reasonable compensation to said Robert N. Archer and Thomas F. McGarry, trustees, and their successors, for their services in the premises, not exceeding one hundred ($100) dollars per month to each, but the said Archer and McGarry assume no personal obligation in regard to the sums mentioned in this paragraph, but merely consent that they may be ultimately paid out of said property.

"III. As security for the payment of these various sums, the parties of the second part undertake to obtain conveyances from the owners of the timber in Graham County, North Carolina, fully set forth and described ·in the contract between the parties of the first and second part, entered into on the 8th day of January, 1895, conveying a clear and unincumbered title thereto to the said Robert N. Archer, of Cincinnati, Ohio, and Thomas F. McGarry, of Grand Rapids, Michigan, as and hereinafter called "trustee," under a suitable deed of trust prepared and agreed upon and executed by the parties in interest contemporaneously with the signing of this agreement; and in case of non-payment·to said Archer of any of the amounts when due, and for sixty days thereafter, the said whole amount then owing said Archer shall become due and payable at once, and said 'trustees,' or either of them, in case the other refuses to act, at the option of said Robert N. Archer, shall proceed to sell said Graham County lands, and other lands hereinafter mentioned, or in any part thereof, after four consecutive weeks, to parties in interest, at public auction, and pay the proceeds thereof towards the liquidation of amounts unless the said Archer shall exercise the option to assert his original rights, as specified in the seventh paragraph hereof. And said Archer or said McGarry, or both, their successors, are authorized to bid on said property, or any part thereof, at any sale of said property.

"IV. Simultaneously with the execution hereof, as further security for the payment aforesaid, the said parties of the second part undertake to be deeded from all the owners of the Graham County lands (except J. W. Cooper and the estate of Caleb S. Bragg, deceased, deeds conveying the clear and unincumbered title thereof in fee, but in trust to said Robert N. Archer and Thomas F. McGarry, as trustees, as well as

deeds conveying the clear and unincumbered title thereof in
fee, but in trust, to about twenty thousand acres of land in
the counties of Swain, Clay and Cherokee, North Carolina,
owned by the parties mentioned in the first recited clause of
this agreement (except said Cooper and said estate of Caleb
S. Bragg, deceased), under and upon the same expressed
trust as specified in the deed of the timber in Graham County,
North Carolina, aforesaid; and also, as soon as practicable
thereafter, to obtain, if possible, deeds from said Cooper and
estate of Caleb S. Bragg, deceased, covering their interest
in the property aforesaid, if the same can be done under suit-
able terms and arrangements: *Provided, however,* that the
deeds of the twenty thousand acres in Clay, Swain and Chero-
kee counties, aforesaid, and the deed of the fee of the lands
in Graham County, aforesaid, shall subject said property by
them conveyed to the payment of the following parties, on
or before five years from the date hereof, with interest at the
rate of six (6) per cent per annum:

| | |
|---|---:|
| "Estate of J. W. Cooper, Murphy, North Caro- lina | $10,536.42 |
| "Estate of C. S. Bragg, Cincinnati, Ohio | 7,500.00 |
| "Henry Stix, Cincinnati, Ohio | 20,000.00 |
| "Nathan Stix, Cincinnati, Ohio | 6,975.00 |
| "D. M. Hyman, Denver, Colorado | 3,500.00 |
| "Louis Krohn, Cincinnati, Ohio | 25,000.00 |
| "Chas. C. and Geo. H. Hopkins, Lansing and Detroit, Michigan | 15,000.00 |

"That with the exception of the first two sums of those
last above mentioned, to be paid to the estate of J. W. Cooper
and the estate of C. S. Bragg, which are to remain liens only
on their undivided interests, respectively, in said lands,
and are to be paid only in case said estate of Cooper and said

estate of C. S. Bragg, deceased, make the conveyances aforesaid, all other amounts shall be subordinated to the said Archer for the sum to be paid to him, and of said expenses, taxes, counsel fees, costs and Boom Company note; and after the said Archer's lien, said Henry Stix shall have priority over the balance for the sum of ten thousand ($10,000) dollars, and interest [on] one-half of the sum due him; otherwise said sum last above itemized, including the remaining ten thousand ($10,000) dollars, and interest, to Henry Stix, shall be paid ratably; which deeds of conveyance and the amount due thereon, and the terms upon which the same shall be delivered, shall first be deposited in escrow with the Union Savings Bank and Trust Company, of Cincinnati, Ohio, hereinafter designated as the "depository," to be delivered by it to said trustee, when this contract is signed and delivered: *Provided,* also, that the said trustees shall, prior to final payment, have the right to sell the timber separately on the said twenty-thousand-acre tract, to be cut and removed therefrom; but no title therein shall pass to or vest in the purchaser of said timber until the sum of one dollar per thousand feet of timber shall be first paid in or deposited with the said depository for and on account of the indebtedness of the estate of J. W. Cooper, estate of C. S. Bragg, deceased (provided they deed to said trustees, Henry Stix, Nathan Stix, D. M. Hyman, Louis Krohn and Charles C. and George H. Hopkins, to whom the same shall be disbursed by said depository, preferring the estate of J. W. Cooper and the estate of C. S. Bragg, provided they deed as aforesaid), and Henry Stix, under the terms, priorities and conditions as aforesaid; but otherwise in proportion to their several and respective indebtedness aforesaid; the balance to be paid to said Robert N. Archer, or sufficient thereof to satisfy his claim in full.

"V. And the said trustees, Robert N. Archer and Thomas

F. McGarry, are also authorized and empowered, at any time, to sell said property, or any part thereof, at private sale, at such price, in such manner and upon such terms and conditions as they deem proper: *Provided, however,* that no such sale shall be made of the whole of said property unless sufficient be realized to satisfy the claims of the several parties herein mentioned, principal and interest, hereinbefore scheduled and set forth.

"VI. In the event of the death or resignation of either or both prior to the termination of said trust, said Robert N. Archer's place shall be filled by the joint agreement of Frank K. Rodman and C. B. Mathews, or their successors, of Cincinnati, Ohio, and Thomas F. McGarry's place by Krohn and D. W. Belding, or their successors, of Cincinnati, Ohio; and in case either side fails to act for ten days after vacancy, the others shall make said appointment.

"VII. In consideration of the premises aforesaid, and as further security for the several amounts aforesaid, the said Robert N. Archer agrees to legally execute and deposit with said depository a deed for the said timber in Graham County, North Carolina, and his interest in the boom and mill at Lenoir, Tennessee, all his interest in the Tennessee Improvement Company, conveying the same to the said Robert N. Archer and Thomas F. McGarry, for the purposes of the trust herein specified; and an absolute and complete discharge and satisfaction of the judgments obtained by him in Tennessee and North Carolina, aforesaid; and a release of all personal liability for the payments provided in this agreement, to be delivered by said depository to Louis Krohn and Thomas F. McGarry upon the payments of the moneys mentioned above to said Robert N. Archer; and in case of the non-payment of the moneys above mentioned to said Robert N. Archer, in manner and form as above expressed, the said Robert N. Archer shall, for the space of ninety days after any

default, have the option to enforce this instrument or be remitted to his original rights under the contract of January 8, 1895, and the suits mentioned [in] the third paragraph hereof, as if this contract had never been made, and said discharge and satisfaction and said deed just mentioned shall be null and void, and all parties shall be returned to their original rights.

"VIII. It is further mutually understood and distinctly agreed that, after the payments herein provided for in this contract, with interest thereon, shall have been made, the balance or residue, if any, shall belong to and shall be legally conveyed and transferred and assigned to Milo M. Belding, of New York City, New York; Alvah N. Belding, of Rockville, Connecticut; David W. Belding, of Cincinnati, Ohio, and Thomas F. McGarry, of Grand Rapids, Michigan, their heirs, legal representatives and assigns.

"IX. Said Robert N. Archer further agrees to convey, at the same time, to said trustees, for the purpose of the trust, the amount of money, if any, now in the hands, in the custody and control of or due Master and Receiver of the Superior Court of Graham County, North Carolina, as well as the Master and Receiver of the Chancery Court of London County, Tennessee.

"X. It is distinctly understood and expressly agreed that no authority is vested in said Robert N. Archer and Thomas F. McGarry, trustees, to incur any liability or debt against the owners of the said property personally, in the use of the property or otherwise; and that the trust imposed upon the said Robert N. Archer and Thomas F. McGarry in this agreement is accepted upon the express condition that said trustees shall not incur any personal liability or responsibility whatever, except for their own wilful and intentional breaches of the trust herein expressed and contained.

"XI. It is further agreed that all moneys received by said

trustees in the matter of this trust shall be deposited with said depository, and that as soon as the sum of one thousand dollars is on hand, applicable to the payment of any of the respective claims to be paid under this contract, it shall be so applied by the depository, upon the receipt of the joint voucher or vouchers of said trustees.

"XII. It is further mutually agreed that upon receiving payment in full and being relieved from all obligations in premises, the said Robert N. Archer's trusteeship herein shall cease and terminate, and that he shall thereupon execute the necessary deeds and conveyances, without recourse to him, to legally vest the property in the successors or the owners, as the case may be.

"XIII. It is further agreed, that after the payment of the said Robert N. Archer in full, all the lands and timber hereinabove mentioned shall, as security for the payment of any of the same due the parties mentioned in paragraph four of this contract, in the order therein expressed, and said lands shall be sold or disposed of, and the avails in the depository paid under the terms and provisions of this agreement.

"XIV. The trust herein created is hereby fixed and terminates five years from the date hereof, but shall remain as long as any of the funds herein provided for remain unpaid; but no charges shall be made for their services by said trustees after said five years.

"XV. Said Henry Stix and Nathan Stix are hereby, by each of the parties hereto, absolved, released and discharged from any and all personal liability which may in any manner be claimed to exist against them, or either of them, by reason of any of the amounts claimed or named herein as being due, or under any judgments or suits or proceedings heretofore instituted, to which either of the parties hereto are parties, and all claims which may or might be asserted against them, or either of them, arising out of said suits or any of the pro-

ceedings hereinbefore referred to, or under this contract, is, by each of the signers hereof, expressly waived and released, and all such claim is, in consideration of the premises and the sum of one dollar paid by said Henry Stix and Nathan Stix, expressly waived and hereby discharged; said Robert N. Archer, however, expressly reserving the personal liability,. if any, of all others."

On December 9, 1899, the parties in interest executed the following instrument:

"This indenture, made this the 9th day of December, A. D. 1899, between Milo M. Belding and Emily Belding his wife, of New York City; Alvah H. Belding and Lizzie Belding his wife, of Rockville, Connecticut; David W. Belding and Jea-. nette Belding his wife; Louis Krohn, widower; Henry Stix and Fannie Stix his wife; Nathan Stix and Ricka Stix his wife, all of Cincinnati, Ohio; D. M. Hyman and Bettie Hyman his wife, of Denver, Colorado; and Thomas F. McGarry and Nettie B. McGarry his wife, of Grand Rapids, Michigan, parties of the first part, and Robert B. Archer, of Cincinnati, Ohio, and Thomas F. McGarry, of Grand Rapids, Michigan, trustees, parties of the second part—Witnesseth:

"That the said parties of the first part, for and in consideration of one hundred ($100) dollars, to them in hand paid by the said parties of the second part, the receipt whereof is hereby confessed and acknowledged, do, by these presents, grant, bargain, sell, remise, release and forever quit-claim unto the said parties of the second part, and to their heirs, successors and assigns, forever, the following pieces, parcels and tracts of land, situate in Graham County, North Carolina, and described as follows, to-wit: (Here follows description of the lands). Together with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining: To have and to hold the same, and every part thereof, unto the said parties of the second part, their

heirs and assigns, in trust for the use, benefit and security as hereinafter mentioned, of the several persons, their respective executors, administrators and assigns, and for the purpose of carrying out a contract of even date herewith between Robert N. Archer, of the one part, and Thomas F. McGarry and Louis Krohn, trustees, of the other part, with the preference, priority and distinctions herein mentioned; nevertheless, to take immediate possession of the same, manage, control, safeguard, sell, dispose of, cause to be manufactured and sold, the timber of said lands, in whole or in part, or in such manner as the said parties of the second part shall deem best to convert said timber or lumber into money, in the speediest and most advantageous way, but without authority to incur any indebtedness or liability binding upon grantors, and immediately deposit their proceeds in the Union Savings Bank and Trust Company, of Cincinnati, Ohio. With and out of the avails of such money, the said Savings Bank and Trust Company, upon vouchers duly approved by said trustees, shall—

"1. Pay and discharge the just and reasonable expenses, costs and charges of handling said property, and in managing and conducting the affairs of the same, including the expense of any agent or agents therein employed; to pay all taxes which shall be levied and assessed thereon, and all expenses, costs, charges, counsel fees in the premises, and a reasonable compensation to the parties of the second part, or their successors, for their services in the premises, not exceeding the sum of one hundred ($100) dollars per month each: *Provided,* that no more than this amount shall be paid from said trust for services, notwithstanding a similar amount is provided in a certain deed executed by David W. Belding and wife and Henry Stix and wife, of even date herewith.

"2. To pay or deposit with the Union Savings Bank and Trust Company, of Cincinnati, Ohio, the amount of one ($1)

dollar per thousand feet for all the timber or lumber sold and removed from the lands embraced in this conveyance, in the counties of Cherokee, Clay and Swain; it being the intention of this paragraph of this instrument that before any title shall pass to or vest in the purchaser of said timber so removed from tracts situated in the counties of Clay, Swain and Cherokee, the sum of one dollar per thousand feet shall be first paid in and deposited with the said Union Savings Bank and Trust Company, and on account of the indebtedness of J. W. Cooper, estate of Caleb S. Bragg, deceased, Henry Stix, Nathan Stix, D. M. Hyman, Louis Krohn and Charles C. and George H. Hopkins, to whom the same shall be disbursed by the said Union Savings Bank and Trust Company, as provided in a certain contract or agreement entered into as of this date between said Robert N. Archer, as party of the first part, Louis Krohn and Thomas F. McGarry, as trustees, parties of the second part, and the Union Savings Bank and Trust Company, of Cincinnati, Ohio, as party of the third part.

"3. Pay and discharge in full the amount due to the said Robert N. Archer, at the time and in the manner mentioned in said agreement last above mentioned.

"4. After the payment of said expenses, cost, charges and liabilities as aforesaid, to pay and discharge in full the amounts due estate of J. W. Cooper, estate of Caleb S. Bragg, deceased, Henry Stix, Nathan Stix, D. M. Hyman, Louis Krohn, Charles C. and George H. Hopkins, at the time, in the manner and under the terms and conditions mentioned in the order and under the terms specified; the surplus or residue, if any there be, shall be paid or turned over to Milo M. Belding, Alvah N. Belding, David W. Belding and Thomas F. McGarry, their heirs, legal representatives, nominees or assigns.

"5. And the said parties of the second part covenant and

agree, that upon the payments being made as in the first four paragraphs above provided, they will execute and deliver their deed or deeds to the said Milo M. Belding, Alvah N. Belding, David W. Belding and Thomas F. McGarry, duly, fully and legally conveying to them, their legal representatives and assigns, all the rest, residue and remainder of said property, and every part and parcel thereof.

"6. It is further understood and agreed, however, that the parties of the first part convey no other, further or different rights by this instrument than sufficient to place the title of said lands in the parties of the second part, under and by virtue of this conveyance.

"8. The trust herein created is hereby fixed, and terminates five years from the date hereof; but, however, said lands and timber thereon shall be and remain as security to Robert N. Archer for the payments to be made to him, as set out in said contract at the time therein specified, and shall so remain as security as long as any part of said payments remain unpaid; and in case of default in making any of the payments, as mentioned in the said contracts, said lands and the timber thereon shall be sold by the grantees herein, and the proceeds of said sales shall be paid on account of the sums so due said Archer. And the said lien hereby created shall be paramount to every other lien or interest in said property."

On the 29th day of October, 1900, the defendants Archer and McGarry entered into a contract with Edward J. Leighton and others for a sale of the land in Graham County, the contract being in the following words and figures:

"This memorandum of agreement, entered into this 29th day of October, 1900, between Robert N. Archer, city of Cincinnati, Ohio, and Thomas F. McGarry, of Grand Rapids, State of Michigan, trustees, parties of the first part, and Edward I. Leighton, Frederick W. Bruch, George Reeves, John

Matthews, Benjamin P. Bole and William R. Hopkins, of the city of Cleveland, State of Ohio, parties of the second part—Witnesseth:

"That the said parties of the first part hereby sell to the parties of the second part certain lands, situated in the county of Graham and the State of North Carolina, known as the Belding lands, and which are more particularly described in two certain deeds of conveyance, one dated on the 9th day of December, 1889, and the other dated on the 22d day of March, A. D. 1900, whereby Milo M. Belding and Emily E. Belding his wife, of New York City; Alvah N. Belding and Lizzie Belding, his wife, of Rockville, Connecticut; David W. Belding and Jeanette Belding his wife; Louis Krohn, widower; Henry Stix and Fannie Stix his wife; Nathan Stix and Ricka Stix his wife, all of Cincinnati, Ohio; D. M. Hyman and Bettie Hyman, his wife, of Denver, Colorado, and Thomas F. McGarry and Nettie B. McGarry his wife, of Grand Rapids, Michigan, conveyed to the parties of the first part, as trustees, certain lands in said Graham County, in said deeds described, and all other tracts and parcels of land situated in Graham, Clay, Swain and Cherokee counties, situated in the State of North Carolina, in which the grantors in said conveyance were interested, jointly or in common, and that said lands in Graham County, which were covered by this contract and sold by virtue of the power conferred upon the parties of the first part by the deeds mentioned and by the contracts known as the trust agreement, entered into between Robert N. Archer, individually, and Louis Krohn, of Cincinnati, Ohio, and Thomas F. McGarry, of Grand Rapids, Michigan, trustees, and the Union Savings Bank and Trust Company, of Cincinnnati, Ohio, dated respectively December 9, 1899, February 24, 1900, and March 15, 1900, on deposit with the said Union Savings Bank and Trust Company, of Cincinnati; and the said sale is upon the following terms and conditions:

"1. That the said parties of the second part agree to pay for said lands the sum of one hundred and twenty-five thousand ($125,000) dollars, in the manner following, to-wit: The sum of fifteen thousand ($15,000) dollars cash, upon the individual claim of the said Robert N. Archer, and the balance of said claim, amounting to seventy-five thousand ($75,000) dollars, in equal payments of fifteen thousand ($15,000) dollars each every twelve months. The cash payment above mentioned to be made and the deferred payments to date from the date of the delivery of the deed of the said premises to the said parties of the second part, upon the conditions hereinafter named. Said deferred payments are to bear 6 per cent interest, payable semi-annually, and to be secured by a first lien on the lands in Graham County, above named, and evidenced by notes of the parties of the second part.

"Out of the purchase-price there shall be allowed the parties of the second part the sum of $10,536.42, for the acquisition of the interest of the Cooper estate in the lands in all four of the counties of Graham, Cherokee, Clay and Swain, in North Carolina, and for the acquisition of the interest of the Bragg estate in the lands in the same counties, the sum of $7,500; but the interest obtained from these two estates in counties other than Graham County shall be for the benefit of the parties of the first part; but for the purpose of accomplishing the acquisition of said interests, the option to purchase the respective interests of the Cooper estate and the Bragg estate shall be assigned to the parties of the second part. If the acquisition of the said interests requires more than the two sums last mentioned, said additional sums shall be paid by the parties of the second part; but they shall be recouped out of the Bragg and Cooper interests in the lands in Cherokee, Clay and Swain counties, so far as said interests are sufficient, and there is no personal liability on the parties

of the first part, or deduction from the purchase-price first above mentioned, other than said sum amounting to $18,-036.42. Six thousand ($6,000) dollars of said purchase-price is to be paid to John G. Creith, as his compensation for the sale of said Graham County lands. The balance of said purchase-price, to-wit, the sum of ten thousand nine hundred and sixty-three dollars and fifty-eight cents ($10,963.-58) is to be paid to the parties of the first part, to be distributed under the terms of their trust.

"This sale is also dependent upon the following further conditions: That there shall not be less than 38,000 acres of land in the purchase, and not less than 140,000,000 feet of timber, outside of the hemlock, of a marketable character, and the parties of the second part are, by November 15, 1900, or sooner, to verify the statement as to the amount of said timber, and to proceed at once and as rapidly as possible to verify the statement as to the title and acreage; as it is understood that the parties of the second part, at their option, need not complete the said purchase unless the above-mentioned acreage of 38,000 acres at least, with the above-mentioned amount of timber, can be conveyed to them by a good title, unencumbered except with the purchase-price mentioned in this contract; and in case said parties of the second part complete the said purchase and go into possession of the said property in Graham County, North Carolina, and should cut more than fifteen million feet of timber per annum, the deferred payments herein mentioned shall be anticipated to the extent of one dollar per thousand feet of timber on the excess over said fifteen million feet, to be paid on said claims of Robert N. Archer, individually, and any or all of these deferred payments may be paid at any time after the date of this contract, whether said payments are due or not. The said parties of the second par are to place in the custody of the Franklin Bank, of Cincinnati, Ohio, a check for $7,500, to be applied

to the first payment to Robert N. Archer when the deed for the said property is delivered in accordance with the terms of this contract. Said sum to be forfeited and paid to the parties of the first part in case the parties of the second part should fail, upon reasonable notice, after compliance with the terms of this contract with the parties of the first part, to accept the said deed and carry out the terms of the contract to be performed by said parties of the second part, it being distinctly agreed that this sum shall be liquidated damages for the general breach of the contract by the parties of the second part."

From a judgment for the defendants, the plaintiffs appealed.

*Merrimon & Merrimon,* for the plaintiffs.
*T. F. Davidson, T. A. Jones, C. B. Mathews, Dillard & Bell,* and *R. L. Cooper,* for the defendants.

MONTGOMERY, J., after stating the facts. The cause of action, as it is stated in the original complaint and in the three amendments, is based upon alleged injury to the plaintiff's interests growing out of the alleged failure of the defendants to discharge their duties as trustees, under the trusts imposed upon them in the several instruments of writing set out in the complaint.

It is alleged that the contracts of November 7, 1893, January 8, 1895, December 9, 1899, and the other contracts and conveyances supplemental to the one of December 9, are all to be construed together, and that they disclose a trust on the part of the defendants Archer and McGarry which required them to take immediate possession of the land and cut and market the timber, and, with the proceeds, pay, first, the expenses and costs of such cutting and marketing the timber, and then apply the balance to the creditors named in the

deeds of 1899, and that that not having been done, a breach of their trust has occurred.

Further specific breaches of the trust are alleged in the amendments to the complaint, as follows:   First, that the defendants Archer and McGarry neglected and failed to prosecute or defend certain civil actions pending in the counties of Graham and Cherokee, involving the title to portions of the land in question, and in neglecting and failing to keep off trespassers and squatters from the land, and preventing them from cutting and removing timber from the same.   Second, that they failed and neglected to pay the taxes upon said land to the county of Graham, and suffered the same to be sold for taxes.   Third, that, as plaintiff is informed and believes, they have suffered a large number of logs, which had been cut previous to the 9th of December, 1899, and left upon said land, to remain there unprotected from the weather, and that the same have decayed and are greatly damaged, if not entirely worthless, to the great damage of the plaintiff. Fourth, that prior to the commencement of this action, as the plaintiff is informed and believes, they professing to act as trustees, and in violation of the trust imposed upon them, entered into a contract with certain parties in said contract named, whereby they undertook to bind themselves to sell and convey the lands in Graham County, and that, upon information and belief, the amount to be realized from said sale is not one-half the value of said land, and said contract shows that said trustees have, in their said negotiations, calculated nicely the amount that would be required to pay the claims of the said Archer, and provide for the purchase of the Cooper and Bragg interest, and pay $6,000 to one Creitch, and the balance to be distributed to said trustees and in payment of counsel fees, leaving nothing whatever to the real owners of said land."

The judgment prayed for by the plaintiff is that the defendants reconvey to the plaintiff his interest in the property

mentioned in the complaint, that they be removed from their trusteeship, and be restrained and enjoined from any further control of the property, and for such other and further relief as the plaintiff may be entitled to.

The defendants answered, and the plaintiff made replication, and his Honor submitted the following issues:

1. Did the defendant Robert N. Archer negligently fail to discharge the duties imposed upon him in respect to the trust property by the memorandum of agreement and deed of trust, dated as of December 9, 1899, and the deed and agreements supplementary thereto?

2. Did defendant Thomas F. McGarry negligently fail to discharge the duties imposed upon him in respect to the trust property by the memorandum of agreement and deed of trust, dated as of December 9, 1899, and the deed and agreements supplementary thereto?

3. Was the price at which the said defendants undertook to sell said land in Graham County a fair price for the same?

The record in this case contains nearly six hundred pages. A considerable portion of it has been of no service to the Court, but has served rather to embarrass and perplex us. There are ninety-six exceptions brought up for review, one concerning venue, one concerning a motion to make new parties, fifty-six on matters of evidence, one concerning the issues tendered by the plaintiff, and the remainder in respect to his Honor's charge, and his failure to give instructions asked by the plaintiff.

A motion was made by the defendants to remove the case from Cherokee County to Graham County, for the convenience of the witnesses, and it was announced by the Court that the removal would be made to Graham County. Upon objection being made by the plaintiff, his Honor said that, in order that a speedy trial might take place, he would remove it to either Graham, Macon or Clay, and stated to the plaintiff that

he might select either of those counties. Whereupon the plaintiff's counsel said he would "take" Clay County, if he was compelled to choose, and the case was removed to that county. Whatever irregularity there may have been in the proceeding was cured by the action of the plaintiff himself. His Honor had the power, under the statute, Code, Sec. 195, subsection 2, to remove the case to Graham for the convenience of the witnesses. The plaintiff, instead of submitting, chose Clay County instead of Graham, and he can not complain.

The plaintiff, a few days before the trail, served a notice on the defendants that he would move to make Leighton and others, the would-be-purchasers of the land, parties-defendant to the action, and before entering upon the trial the plaintiff moved for the order, and the same was refused. The matter was discretionary with the Court. The plaintiff, when he issued the summons and drew his complaint knew the relation of those persons, whom he sought to make parties, to the subject-matter of the suit and their interest in the controversy, as well as he did when he made the motion. If the motion had been made by the defendants themselves to become parties, the case would have been different.

Exceptions 3 and 4 were made to the refusal of his Honor to admit evidence concerning matters which were embraced under the contract of 1893 and 1895. Together with these exceptions we may consider the refusal of his Honor to submit the third issue tendered by the plaintiff, which was in these words: "Did the defendant Robert N. Archer negligently fail and refuse to perform his covenants, obligations, stipulations and duties under the contracts of 1893 and 1895, as the same were consolidated by the contract of the 8th January, 1895, in breach of trust contained in last named said contract?" And also that part of his Honor's charge, excepted to by plaintiff, which, in substance, was that, by the

terms of the judgment of Loudon County, Tennessee, the judgment of the Superior Court of Graham County, North Carolina, and the memorandum and agreement and deed of trust, of date December 9, 1899, the contract of November, 1893, and the one of January 8, 1895, were annulled and merged into the said memorandum and agreement and deed of trust dated December 9, 1899, and that they should not consider the contracts of 1893 and 1895 in making up their verdict; and that the duties and powers and responsibilities of the defendants Archer and McGarry are set forth in the memorandum of agreement and deed of trust of the 19th of December, 1899, and the supplemental agreements thereto, and these different instruments should be construed together as one instrument in determining the rights of the parties in this action. We think his Honor committed no error either in refusing the evidence, in refusing to give the instruction asked, or in giving the instruction which he did give. The record in the Tennessee and North Carolina suits, and the agreement and trust deed of December 9, 1899, show upon their face that the ends and objects for which the contracts of 1893 and 1895 were executed were concluded, that they had ended disastrously to all the parties concerned, and with a very large debt due to the defendant Archer under the terms of those contracts; that the agreement between the defendants of December, 1899, referred to the litigation concerning the contracts of 1893 and 1895, and the parties, to put an end to all those matters and litigations, stated and fixed the debt due to the defendant Archer at $85,000, and, as far as could be done, agreed upon the manner and method of payment of that debt by a sale of the property mentioned in the agreement; and the parties in interest, the plaintiff and the others, in December, 1899, undertook to carry out the agreement and memorandum. That part of the property embraced in the contracts of 1893 and 1895 which was conveyed by the

agreements and deeds of December, 1899, is dedicated to different purposes entirely from those for which it was used under the contracts of 1893 and 1895.   There is not a stipulation in the contracts of 1893 and 1895 like any one in the agreement and deed of 1899 ; in fact, there is nothing left in law or in fact of the contracts of 1893 and 1895.

It was contended, however, for the plaintiff that the contract of 1895 was still in force, and to be construed with the other written contracts bearing on the case, because of the last clause of article seven of the memorandum and agreement of December, 1899, reference is made to the contract of 1895.   That reference is in these words: "And in case of the non-payment of the moneys above mentioned to Robert N. Archer, in manner and form as above expressed, the said Robert N. Archer shall, for the space of 90 days after any default, have the option to enforce this instrument or be remitted to his original rights under the contract of January 8, 1895, and the suits mentioned in the third paragraph hereof, as if this contract had never been made, and said deed just mentioned shall be null and void, and all parties shall be returned to their original rights."   Now, if that section seven of the memorandum and agreement of December, 1899, had been the only power given in that instrument, by which Archer and his co-defendant, McGarry, could have sold the property mentioned in the agreement for the payment of Archer's debt, then the contract of 1895, together with the suits referred to, would have been in force, and the agreement and deed of trust of December, 1899, would have been void and of no effect.   But there is another clause or section in the agreement and memorandum of 1895, which confers upon Archer and McGarry, trustees, the power to sell the property for the payment of Archer's debts, and also for the payment of other debts mentioned in the agreement; and the power is in these words: "And the said trustees, Robert N.

Archer and Thomas F. McGarry, are also authorized and empowered, at any time, to sell said property, or any part thereof, at private sale, at such price and in such manner, and upon such terms and conditions as they deem proper; provided, however, that no such sales shall be made of the whole of said property unless sufficient be realized to satisfy the claims of the several parties herein mentioned, principal and interest, hereinbefore scheduled and set forth."

The reasonable construction of the two distinct powers given to the trustees to make payment of the debts mentioned in the agreement, is this: Under section five of the agreement, the power was conferred upon *both* Archer and McGarry to make sale of the property *privately*, according to their best judgment, at any time they may see fit during the five years of the life of the agreement; in section seven of the agreement an additional power was given to Archer himself and alone, without the co-operation, or even assent, of McGarry, the other trustee, to sell *publicly*, at auction, and after advertisement of the sale, the entire property, provided he would do so within 90 days after any default in the several amounts due to him; and further, it was intended by the agreement and memorandum of 1899 that if Archer preferred not to proceed under section seven and sell the property at public auction, he should have the option, the privilege, of proceeding under his contract of 1895, and the suits in London County, Tennessee, and Graham County, North Carolina.

Under section seven of the agreement of 1899, Archer had no right to make sale *himself* for the purpose of paying his debt with the proceeds after 90 days from the time the first default occurred; and he alone made no effort to sell at public sale. He therefore had the option to proceed under his judgments based on the contract of 1895, but he did not do that. He, together with the other trustee, McGarry, proceeded to make the sale *privately* under article five of the

agreement and memorandum. The power, the authority, for Archer and McGarry, when acting together, to make sale of the property privately, under section five of the agreement and memorandum of December, 1899, is not denied in the plaintiff's complaint, nor in his replication, but is admitted. The insufficiency of the price agreed to be paid for the property, going to show a breach of trust, is the gravamen of the plaintiff's complaint, and that is clearly to be seen from a reading of the ninth of the plaintiff's tendered issues, viz.: "Was the price at which the said defendants undertook to sell said land in Graham County a full price for the same, as alleged in the defendants' answer ?"

The defendants, trustees, Archer and McGarry, having the power to sell the property privately, have entered into an agreement with certain persons called the Cleveland parties for that purpose. Exception is made by the plaintiff to the terms of that agreement, the contention being that upon its face it is beyond the power of the defendants to make. We have examined it carefully, and are of the opinion that the defendants have not exceeded their power in the execution of it.

The fourth exception was to the refusal of the Judge to allow a report concerning the property, made by McGarry alone in April, 1900, to be used as evidence against Archer. Clearly the paper was inadmissible against Archer. Archer could not be deposed from his trust because of any conduct on the part of McGarry not known or approved by Archer. His Honor was correct in overruling exceptions 5 and 6, in which his Honor refused to allow the plaintiff to give his reason why he entered into the deed of trust of December, 1899. However, the evidence substantially got in, because, on the question of the value of the timber, his Honor allowed the plaintiff to testify as follows: "It was reported by McGarry that he would get some $250,000 for the standing

timber on the 49,000 acres of land, or thereabout, that was originally transferred to Archer, leaving the land and whatever minerals there were in the original owners' hands." A witness, Coburn, was introduced by the plaintiff, who gave testimony tending to show that logs could be cut and floated down the streams in Tennessee to certain mills in that State, operated by the Crosby Lumber Company, the same mills that the defendant Archer had been operating under the contract of 1895. That witness was asked by the defendant, on cross-examination, if the Crosby Lumber Company did not fail in their operations, and that they quit insolvent. The question was a proper one. The plaintiffs were seeking to hold the defendants responsible for not getting out their logs to market under the agreement of 1899, and the defendants had a right to show that those persons who had embarked in that enterprise had failed, as evidence of their good faith; that was the seventh exception. The answer which was in response constituted the eighth exception. The ninth exception was directed to the permitting of a question to be put to an expert witness, Harrell, as to how he spent his time while he was prospecting the property. We see no objection to the question, but the witness made no answer.

Excetions 10, 22, 23, 24, 25, 26, 27 and 28 refer to lappages of other surveys of land upon those mentioned in the complaint and answer. The contention of the defendants on this question was that the acreage of the land mentioned in the pleadings had been, to a considerable extent, reduced by a discovery of various lappages of other surveys and tracts of land over those mentioned in the pleadings, and that that fact ought to be considered by the Court on the question of the value of the land contracted to be sold by Archer and McGarry to the Cleveland people. A surveyor, acquainted with the land and who had done surveying in reference to these lands and the lappages, was introduced for the purpose

of showing these lappages and the extent of them. So far as we can see, the witness testified to nothing except what he had practical knowledge of and definite information about, in reference to the lappages. He did not have particular surveys of these lappages, but he had other surveys connected with the adjoining tracts that gave him such information as that he would reasonably make estimates of the lands embraced in the lappages, and that he did. The exceptions are therefore without merit.

'Exceptions from 11 to 15, inclusive, relate to letters and communications made by McGarry individually to the owners of the property, without the knowledge of Archer. They were not admitted as evidence against Archer, and there was no error in his Honor's ruling.

Exceptions 16, 17, 18, 19, 20, 20a and 20b, relate to the records of the suits in Graham County, North Carolina, and in Loudon County, Tennessee. The evidence was properly received. It does not make any difference whether the plaintiff was a party to those suits or not, so far as the introduction of the records was concerned in this case, for the memorandum and agreement entered into between the defendants in December, 1899, referred to these suits, and while it was said that the judgments were disputed as to their validity, yet the recital in that memorandum and agreement of December, 1899, after referring to the suits and judgments, further recited, "Now, therefore, in order to settle said matters and all litigation, it is hereby mutually agreed as follows: 1. That the amount due to said Robert N. Archer is hereby settled and agreed upon as follows, at the sum of $85,000." The plaintiff in his deed of trust, made in December, 1899, pursuant to the memoranda and agreement of the same date, recognized the terms of the memorandum and agreement and the settlement made therein. The records of the Court then were admissible to show that the matters which the plaintiff

alleged were still open and unsettled by the contract of 1895, had been determined and settled, and were the matters referred to in the memorandum and agreement of 1899.

The defendants offered in evidence the deed from Archer and wife to Thomas F. McGarry and Robert N. Archer, as trustees, and also a bill of sale from the same to the same. It is not stated in the record what property was conveyed in these instruments, nor for what purpose they were made; and the instruments themselves are not in the record. But if they were before us, we can not see why the property conveyed therein did not vest in the other trustee, McGarry, even if the objection on the grounds stated, to-wit, that Archer, as an individual, could not convey to himself as trustee, could be maintained. We think exception 29 can not be sustained for the same reason given in the discussion of exceptions 10, 22, etc.

Exception 30 is about a harmless matter. A question was put to a witness as to whether he had heard of any large sales of land in Graham County. He answered that he had only known of them through hearsay. Nothing further was said, and no harm was done.

Exceptions 31, 32, 33, 34, 37, 38, 39 and 40 relate to the value of lands in Graham County, as evidence of the value of the lands described in the pleadings in this case. The defendants were undertaking to prove the value of the land in Graham County, which they had contracted to sell to the Cleveland people, by showing the value of other mountain lands in Graham County similarly situated and of similar character. We think the evidence was competent. In *Warren v. Makely*, 85 N. C., 12, it was undertaken to show the value of a certain tract of land by proof of the value of a certain tract of land by proof of the value of an adjoining tract. There, there was no evidence of similarity in the character of the soil, quality of the land, or of anything going to show that the two tracts were alike, and the evidence

was not allowed. But, in discussing that case, Smith, C. J., said: "The question is simple and absolute, unaccompanied with any suggestion that the two tracts possessed the same or similar qualities in soil, culture, location or improvement, or possessed in common the elements that enter into the estimate of their respective values. * * * As presented to us in the record, and without any explanatory circumstances, the question was properly excluded as irrelevant and misleading." Those very matters are presented here in our record, and we are of the opinion that they make the evidence competent.

Exceptions 41, 54 and 55 relate to the practicability of removing, manufacturing and selling the timber from the lands of the defendants. A witness, who testified that he was 52 years old, that he had been in the lumber and timber business for 35 years, that he had worked in lumber in all capacities, in the woods, part of it from a chore boy up to scaler, foreman and superintendent, and that he had tried to keep posted in every location where there was timber manufactured and for sale, and that he took the best lumber journals, etc., and who further testified that he took charge of the property with a view to make a sale of it for the defendants, and that he became acquainted with the timber and location, the rivers and the roads, and the general character of the country; was asked whether or not, from his knowledge of that country, the location of the timber, his experience as a lumber man and timber man, if it would have been practicable for these trustees to have undertaken to have that timber manufactured and sell it profitably, he answered, "No, I do not." The plaintiff's exception, upon objection to the question and answer, was that it was not competent for the witness to give his opinion upon the question presented, and that it was undertaking to give the witness the opportunity to decide what is the province and duty of the Court and jury to pass upon, and therefore incompetent. It is common

learning that opinion evidence, as a rule, ought not to be received. But there are exceptions to the rule, and it seems to us that this is a proper instance in which an exception ought to be allowed. And the witness may not be treated as an expert, but as an ordinary witness who is entitled to an opinion based upon facts within his own knowledge, the circumstances from which that opinion is deduced being such as can not be made palpable to others. There are so many contingencies and difficulties, inherent and extraneous, about the timber business, especially in mountainous sections lacking facilities for transportation, nearness of markets, etc., that it would be almost impossible for the ordinary jury to arrive at a just estimate of the expense attending such a business, without the aid of the judgment and opinion of those persons who have experience in the same.

Exceptions 42 and 43 can not be sustained. The paper-writing introduced as evidence was collateral to the issues, and its contents provable without producing the paper. *Carden v. McConnell,* 116 N. C., 875.

Exceptions 44, 45 and 46 relate to interviews between Archer and C. R. Palmer and Ridder, in reference to a sale of the land and an option to purchase. It was competent to show efforts to sell the property, good faith, etc.

Exception 47 was to the permitting of Archer to give evidence of a conversation between himself and a chemist on an analysis of some samples of mineral earth submitted to him for examination. The Court admitted it only for the purpose of showing good faith, and not on the question of the value of the land.

The forty-eighth exception relates to the exception of Archer to the effect that the plaintiff, through McGarry, who represented him, wished to pay the first instalment of the debt due to Archer, and had offered to raise his part of it. We see no error in its admission.

The forty-ninth exception was entered to the permission of his Honor for Archer to state how the debts due to the Cooper and Bragg estates, mentioned in the agreement of December 9, 1899, were arrived at. If it was not material, it was harmless.

Exceptions 50 and 60 refer to the ruling of the Court on the matter of the issues. The plaintiff tendered, in the first place, nine issues, which were all refused, and, later on during the course of the trial, tendered another one as to the damages the plaintiff might be entitled to on account of any breach of the trust. It is not stated what became of the last issue tendered, but as it was not submitted to the jury, his Honor must have declined it for the reason that no evidence had been offered to show damages. We have seen that his Honor committed no error in refusing the third issue tendered, and he committed none in refusing the other eight, for they simply particularized the alleged breaches of trust, and the ones submitted covered the case and were clear.

Having treated the exceptions to the evidence and those concerning the issues, we come to a consideration of the law of the case.

The defendants, Archer and McGarry, were charged with the execution of the most responsible trusts concerning very valuable property. That property was to be utilized by them for the payment of a very large indebtedness in the way of incumbrances upon the same. As we have already said, in the discussion of one of the matters of evidence, the defendants had the power, under the agreement and deed of December, 1899, to make a private sale of the property, in whole or in part, and at any time they saw fit. In the memorandum and agreement of December, 1899, there was no provision made for, nor any suggestion of, the manufacture and sale of the timber separate from the land itself. But the deed made by the plaintiff and others to the defendants, Archer and

McGarry, in 1899, contains this provision (quoted *literatim et punctuatim* from the pleadings and from the instructions given by the Court to the jury) : "Nevertheless to take immediate possession of the same, manage, control, safeguard, sell, dispose of, cause to be manufactured and sold the timber off said lands in whole or in part, in such manner as the said parties of the second part shall deem best to convert said timber or lumber into money, speedily and in the most advantageous way, but without authority to incur any indebtedness or liability upon grantors." In addition to what we have already said on the power of Archer and McGarry to sell the property, it may not be amiss to add that, if the language just quoted was all that was used in the agreement and memorandum and deed of 1899 on the subject of the sale of the land itself, we would have grave doubts about the power of the defendants to sell the land, which they have contracted to sell to the Cleveland people. But the deed of 1899, as we have seen, refers to the memorandum and agreement of the same month and year, and the makers declare it their purpose to carry out the memorandum and agreement, that latter agreement giving, as we have seen, full power to sell the land itself. And, besides, the deed itself, in the last clause, reads, "and in case of default in making any of the payments, as mentioned in the said contracts, the said land and the timber thereon shall be sold by the grantees herein, and the proceeds of said sale shall be paid on account of the sums so due said Archer."

In the discharge of their duties as trustees, it was in their sound and honest discretion, in making provision for the payment of the indebtedness, to take choice between a sale of the land itself for that purpose and the undertaking of the cutting and manufacturing of the timber or lumber, separate from the land. They were not required to test the experiment of the latter plan, if they honestly and reasonably be-

lieved that it ought not to have been tried. If they thought the best plan to relieve the indebtedness was by a sale of the land itself, they had the power to sell it, and it was their duty to do so. They were given that discretion in the memorandum of agreement and in the deed, and all they were required to do was to exercise it conscientiously and with reasonable care.

But the plaintiff, in this connection, insists that it is not in the power of the defendants to make the sale they proposed to make to the Cleveland people, for the reason that there is a proviso in the sale to the effect that no such sale shall be made of the whole of the said property, unless sufficient money be realized to satisfy the claims of the several parties therein mentioned, principal and interest—that is, that the trustees shall not have the power to sell all of said property, whether they sell the same as a whole, or the whole by parcels, unless sufficient money could be realized to pay all the claims secured by the contract; and that there was evidence offered tending to show that the balance of the value of the land, lying in Cherokee, Clay and Swain counties, added to the amount of the contract price of the Graham County land, would not equal the whole of the indebtedness provided for in the deed of 1899. That contention can not be sound. Of course, if all the land had been contracted to be sold for less than the entire debt, the plain words of the deed would prevent such a sale. But the object in view was the payment of the indebtedness by a sale of the property, and, under the contracts, the defendants, Archer and McGarry, had the right to sell any part of the property at such price, in such manner and upon such terms and conditions as they deemed proper. If, therefore, they sold any part of the property less than the whole, in good faith and for fair value, the true intention of the deed would be carried out. The proviso in the deed doubtless was put there to prevent an im-

provident sale of the whole, and to subject the conduct of the
defendants to scrutiny, and to compel them, if they sold the
property in parts or lots, to procure a fair price for such lots.
If it could be shown, however, that the contemplated sale of
the Graham County land affected injuriously the value of the
land lying in the other counties because of the separate sale,
then the trustees would not be allowed to consummate the sale,
even though the price for the Graham County land was its
full value.    It was the duty of the defendants to use their
best business judgment and reasonable skill to raise the
money to pay the indebtedness out of the property, and if
they failed to do so they were guilty of a breach of trust; and
they were to guard and preserve the interest of each benefici-
ary under the trust in choosing between a sale of the property
and the manufacture of lumber; and also in making any sale
of the property, if they chose that way.    And also, if it was
for the best interest of all parties under the trust, for the de-
fendants to have manufactured and sold the lumber, or that
they could have found out that that was the best way of
raising the funds to pay the indebtedness, and failed to do
so, they would have been guilty of a breach of trust.    The
defendants themselves were not required to go upon the prop-
erty, if they used a sound discretion in the selection of
Creith, their agent, who did take possession for them.

The memorandum and agreements, as we have seen, bear
date for the 9th of December, 1899, but there was evidence that
they were not executed or delivered until February, and
Creith, as agent, took possession in the early days of March
following.

The reasonableness of time elapsing between the execution
of the papers and the taking possession of the property by
the defendants' agent, was submitted to the jury, and under
proper instructions.

As we have already said, in discussing the evidence, all

BELDING *v.* ARCHER.

the agreements and contracts concerning the plaintiff and defendants, made prior to December, 1899, were merged into the latter, and they were not for the consideration of the jury. His Honor charged fully along all these lines, and as we have decided the law to be in the matter, and our discussions have been based on the Judge's charge, and the instructions asked by the plaintiff and refused by his Honor. The plaintiff's fifth, sixth, seventh, eighth and twelfth prayers for instructions have not been considered in what we have said, and we will now take them up.

The fifth concerned the evidence in relation to some nonsuits suffered by the defendants in actions brought by others, concerning the trust property. On that instruction, the Court told the jury that the trustees were bound to prosecute the actions if, in their reasonable judgment, the prosecution of such actions was to the interest of the trust estate, and if they should find from the evidence that the nonsuits were negligently had after December 8, 1899, the date of the trust deed, and by reason of the nonsuits injury came to the estate, the defendants would be guilty of a breach of trust—negligence being the want of that degree of care that an ordinarily prudent man would use in the same or similar circumstances.

The sixth prayer for instructions was in relation to depredations by squatters and trespassers on the property. His Honor told the jury, in reference to that matter, that the defendants should have used due diligence and care in keeping trespassers off, and if they should find from the evidence that the defendants, through their agent, did not, after December 8, 1899, use such care and diligence as an ordinarily careful business man would have used in his own business under the same circumstances, then that would have been a breach of trust, and that they should so answer; and if such precaution was taken and such diligence exerted, then they did not commit a breach of trust in failing to keep off the trespassers.

The seventh prayer was concerning the failure of the defendants to pay taxes on the land. His Honor told the jury that if they should find from the evidence that the defendants failed to use their best judgment and reasonable skill, as it was their duty to do, to raise money out of the trust funds, and by reason of such failure the trust property, or any part thereof, was sold for taxes, then they should find that the defendants had committed a breach of trust, and they should so answer.

The eighth prayer for instructions was directed toward the alleged loss of a quantity of felled timber and logs belonging to the trust property, and which were alleged to have been injured and lost by the negligence of the defendants. In reference to that matter, his Honor said that if the jury should find from the evidence that if the defendants, after December 9, 1899, the date of the trust deed, suffered the same to remain there unprotected, and allowed them to decay and become worthless, they had made a breach of trust in that respect, and the jury should so answer. But that it was not incumbent on the defendants to take charge of the logs, if the jury should find that they were worthless, or if the defendants, in their honest and best judgment, were of the opinion that the logs were so damaged that it was not for the best interest of the trust for them to take charge of them. We see no error in the instructions given, and such parts of the ones asked by the plaintiff that were proper were given, and those parts not proper were rejected.

The instructions of his Honor, given on the fifth, sixth and eighth prayers were excepted to by the plaintiff on the ground that there was no evidence to support these instructions. We take a different view of the evidence.

The twelfth special prayer for instructions has been considered in our treatment of the sixth prayer. The jury answered the first and second issues "No," and the third "Yes." We see no error in the trial, and the judgment is

Affirmed.